set forth below.

1. By August 4, 2000, defendant shall file and serve its motion for summary judgment.

2. By August 30, 2000, plaintiff shall file and serve his response.

3. By September 8, 2000, defendant shall file and serve any reply.

SO ORDERED.

_____
THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated:      July 19, 2000
            New York, New York


Copies mailed to:

Jeffrey McAdams, Esq.
Law Offices of Jeffrey McAdams
305 Broadway
Suite 500
New York, New York 10007

Eric Rosenfeld, Esq.
Seyfarth, Shaw, Fairweather & Geraldson
1270 Avenue of the Americas
New York, New York 10020

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 02-B-48191 |
| UAL CORPORATION, et al., | ) | (Jointly Administered) |
| | ) | Honorable Eugene R. Wedoff |
| Reorganized Debtors. | ) | Hearing Date: June 28, 2007 |
| | ) | Hearing Time: 10:00 a.m. |

**UNITED'S RESPONSE TO CLAIMANT PETER HOFFMAN'S "AFFIDAVIT IN OPPOSITION TO DEBTOR'S MOTION TO DISALLOW" [RELATED TO DOCKET NOS. 16622, 16688, AND 16724]**

On May 17, this Court ordered Peter Hoffman to respond to United's dispositive arguments on the merits on his claim. (5/17/07 Tr. at 8-9) In particular, Hoffman was directed to respond to United's argument that even if former supervisor Robert Cafiero promised to process Hoffman's competitive transfer request (CTR) to the pilot ranks in exchange for Hoffman's resignation, Cafiero's alleged failure to do so was irrelevant because *Hoffman could never have become a United pilot*. As United argued, three facts make Hoffman's claim — that a processed CTR would have led to his employment as a United pilot — impossible:

- *First*, under United policy, a CTR can only be granted to individuals that have been with the company for more than twelve months. Hoffman was a United employee for approximately six months, and resigned after being told he was about to be terminated after failing to complete his six-month probationary period.

- *Second*, a CTR can only be granted to actual United personnel. Hoffman resigned in lieu of being terminated. United could not have "competitively transferred" an individual who had resigned from the company.

- *Third*, even had a CTR been processed, and Hoffman interviewed for a pilot position, he never would have been hired. Hoffman — as he conceded multiple times at deposition — was woefully unqualified for the job.

The Court told Hoffman he needed to demonstrate that he "would have been a pilot [because t]hat's the basis for your claim for damages." (5/17/07 Tr. at 9)

Hoffman's response was both untimely[1] and woefully insufficient.  In his response brief, Hoffman provides no evidence whatsoever to even suggest, let alone demonstrate, that he would have become a United pilot had his CTR been processed.  All Hoffman offers is rank speculation that contradicts his sworn deposition testimony.  That is not enough to survive disallowance.

*First*, Hoffman was only a United employee for six months, and he did not successfully complete his probationary period at the company.  (Ex. A, Hoffman Dep. at 55-56)  United's policies limited CTRs to those who had been with the company more than one year:

> Competitive Transfer.  Employees must complete one year of service to be eligible to request transfer.  Thereafter, employees may request competitive transfer after completing one year in the new job classification.

(Ex. B, UAL Personnel Regulations, p. 44 at 5(b)).

Hoffman does not challenge the existence of a company policy prohibiting competitive transfers for employees serving less than a year.  Instead, Hoffman suggests that he should have received a "waiver" from these requirements.  (Hoffman Br. at 2)  Not so.  As a threshold matter, whatever Hoffman's so-called "agreement" with Cafiero actually was (and Hoffman could not remember any details), Hoffman admitted under oath that *he never asked Cafiero for a waiver*:

> Q:  Have you got any evidence, documentation or otherwise, that [Cafiero] promised to get you a waiver of the 12-month requirement?
>
> A:  No, sir.  (Ex. A, Hoffman Dep. 49:14-17)
>
> \* \* \* \* \*
>
> Q:  You have so far not told us that waiver was mentioned in any conversation between you and Mr. Cafiero.

---

[1] The Court ordered Hoffman to respond by June 7, 2007.  (Docket No. 16688)  Hoffman's response was not served until June 11, 2007, and not docketed until June 16, 2007.  (Docket No. 16724)  Hoffman did not seek leave of court to file an untimely response.

A: I have not told you that.

Q: Was it ever mentioned?

A: I don't remember.  (Hoffman Dep. at 50)

* * * * *

**Q:  *Did you ever ask anybody at United for a waiver of the one-year requirement?***

**A:  *I don't know.  I don't think so.*  (*Id.* at 81) (emphasis added)**

Moreover, had Hoffman asked Cafiero for a waiver of United's 12-month rule, the response surely would have been "no."  Cafiero did not himself have authority to grant a waiver of the one-year requirement — only the ability to ask his manager to issue a waiver.  In fact, Cafiero had never personally granted one.  (Ex. C, Cafiero Dep. at 6, 17)[2]  Cafiero specifically told Hoffman that he could not formally process Hoffman's CTR because of the 12-month requirement.  (Ex. C, Cafiero Dep. at 7-8, 11)  Given that Hoffman never asked for a waiver, it is absurd to suggest that Cafiero would have *sua sponte* asked his manager to grant Hoffman a waiver.  It is even more absurd to suggest that Cafiero's manager would have granted a waiver for a now-resigned employee that had failed to emerge from his probationary period at the company and had a penchant for "getting up and disappearing" from his job and not getting along with co-workers.  (Ex. C, Cafiero Dep. at 17, 27).

Altogether, there is no evidence to support Hoffman's claim that he even asked for a waiver from United's 12-month policy, let alone that he could have received one.  Hoffman simply could not have received a CTR.

---

[2] In his Motion, Hoffman claims that 2 other specific United employees received waivers of the 12-month requirement for CTRs to non-pilot positions.  That bald allegation (which Hoffman has no foundation to make anyway) was denied by Cafiero under oath (Ex. C, Cafiero Dep. at 6-7), but it is irrelevant.  Hoffman provides no evidence that *he* would have or should have received a waiver, had he asked for one (which he did not).

3

**Second**, Hoffman concedes that he *resigned* from United on December 18, 1992, in lieu of being terminated. (Ex. D, Hoffman Resignation Letter)  United's policies only permit the granting of CTR requests to **actual United employees**.  (Ex. B, UAL Policy at p. 44)  Once Hoffman resigned from the company, he became ineligible for a CTR under any circumstances. (Ex. C, Cafiero Dep. at 20) ("Q:  And would there be a way to have a waiver of the fact that he was no longer an employee?  A:  If there is one, I am not aware of it.").

**Third**, Hoffman was *not qualified* for the job of a United pilot.  Hoffman presents no evidence that he would have been hired if United's flight operations department had accepted the CTR and interviewed him.  To the contrary, Hoffman admits that he had previously applied for a job as a United pilot, and did not even get an interview.  (Ex. A, Hoffman Dep. 77)  Similarly, Hoffman applied for jobs at Continental and American and was summarily rejected.  The reason was simple: as Hoffman admitted under oath, he "didn't have sufficient experience to qualify for a job with United, American, Continental or any of the [Part]121 carriers." (*Id.* at 80)[3]  Hoffman provides no evidence that United had hired people with qualifications similar to his in the past, and nothing remotely suggests that he could have been hired as a United pilot.  *Cf. Sutton v. United Airlines, Inc.*, 130 F.3d 893, 905 (10th Cir. 1997) (for purposes of ADA, "all pilot positions at all airlines . . . require the same or similar training, knowledge, skills, or abilities").[4]

---

[3] "Part 121" is the set of federal regulations governing commercial airlines such as United. 14 CFR Part 121.

[4] Hoffman's verified response states, in conclusory fashion, that he "had already achieved more than the requisite licenses, rating and experience to qualify for the Pilot position at UAL." (Mtn. at 5 ¶ V).  That allegation is contradicted by Hoffman's deposition testimony, and "[w]here a deposition and an affidavit are in conflict, the affidavit is to be disregarded and the court should only consider the deposition." *Kaplan v. City of Chicago*, 2004 WL 2496462, at *2 (N.D. Ill. 2004) (quoting *Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001)); *see Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996); *Buttron v. Sheehan*, 2003 WL 2180112, at *4 (N.D. Ill. 2003) (affidavit entitled to "zero weight" when contradicted by deposition testimony) (citing *Beckel v. Wal-Mart Assocs., Inc.*, 301 F.3d 621, 623 (7th Cir. 2002)).

At deposition, Hoffman testified that he would have been able to secure a pilot position through a CTR despite his lack of qualifications because, as a former United employee, he would have been an "insider."    (Ex. A, Hoffman Dep. at 78-79)  But Hoffman offers nothing whatsoever to substantiate that claim.  There is no evidence that United prefers "insiders" applying for pilot jobs over "outsiders."  In fact, there is nothing in the record at all — and Hoffman points to no piece of evidence — indicating that a request for a CTR to the pilot ranks would be treated any differently than the basic pilot application that Hoffman concedes would have been rejected by United or any other airline due to Hoffman's lack of qualifications.

Said differently, there is nothing in Hoffman's pleadings, or the evidence he cites to, that could lead any trier of fact to conclude that had Hoffman's CTR been processed and he been considered for a pilot position, he would have been hired.  To the contrary, the record demonstrates that Hoffman never could have been a United pilot, and therefore that he has no cognizable damages to pursue through a proof of claim.  Accordingly, for the reasons described above, in its original objection, and in its motion for reconsideration with respect to the statute of limitations [Docket No. 16073], United respectfully requests that the claim of Peter Hoffman be disallowed.[5]

---

[5] Hoffman's brief on the merits also requested additional discovery (Motion, p. 4-5), a request repeated in a separate "Affidavit in Support of Discovery and Stay" also filed by Hoffman.  [Docket No. 16723]  Hoffman is not entitled to any additional discovery because, contrary to the false statement in Hoffman's motion (p. 5 ¶ VII), discovery closed in the U.S. District Court for the Southern District of New York prior to United's bankruptcy. United provides all of the court orders establishing the close of discovery and a response to Hoffman's discovery request in an opposition brief to Hoffman's "Affidavit in Support of Discovery and Stay" also filed today.

Dated: Chicago, Illinois
      June 18, 2007

Respectfully submitted,

  / s /  Michael B. Slade
Marc Kieselstein (ARDC No. 6199255)
David R. Seligman (ARDC No. 6238064)
Michael B. Slade (ARDC No. 6274231)
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601

Counsel for the Reorganized Debtors

6

A 54

# EXHIBIT A

1

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

3

- - - - - - - - - - - - - - - - - - - - - - - - - -x

4

PETER HOFFMAN,

5

Plaintiff,

6

v.

99 Civ 1375 (WHP)(THK)

7

UNITED AIR LINES, INC.

8

Defendant.

9

- - - - - - - - - - - - - - - - - - - - - - - - - -x

10

11

12

March 29, 2000
11:00 a.m.

13

14

15

Deposition of PETER HOFFMAN, taken by
defendant, at the offices of Seyfarth Shaw

16

Fairweather & Geraldson, 1270 Avenue of the

17

Americas, New York, N.Y. 10020; before Joseph B.

18

Pirozzi, a Registered Professional Reporter and

19

Notary Public of the State of New York.

20

21

22

23

24

25

Hoffman                                49

1

2  and employee is eligible on 6/15/93.  Needs a

3  waiver."  And I have to assume that this UG Revision

4  583 came from a personnel person that knows about

5  this and indicates a waiver is needed.

6          Consequently, this is incomplete.  And it

7  is also possible that had Bob attached the waiver to

8  Exhibit D 3 C there was another document that said

9  another personnel person would have needed another

10 document that I haven't even contemplated.

11         His job was, if he was going to meet the

12 spirit and agreement that we discussed, was to get

13 it put in the pile as an eligible candidate.

14     Q.    Have you got any evidence, documentation

15 or otherwise, that he promised to get you a waiver

16 of the 12-month requirement?

17     A.    No, sir.

18     Q.    Did you not know about this 12-month

19 requirement when you started with United in

20 June '9?

21     A.    I would imagine that I did know.

22     Q.    Did you not learn about this in your

23 orientation?

24     A.    That I did not know.  Sometime during my

25 employment I did, absolutely.  I would believe I

1

2    did.  It does not come as a shock to me.

3         Q.    You have so far not told us that waiver

4    was mentioned in any conversation between you and

5    Mr. Cafiero.

6         A.    I have not told you that.

7         Q.    Was it ever mentioned?

8         A.    I don't remember.

9         Q.    Mr. Hoffman, think real hard, you're at

10   the heart of your lawsuit.  Was it ever mentioned or

11   not?

12        A.    I can't remember.  But I will say this,

13   back to what I said a few minutes ago --

14        Q.    Don't bother.  Tell your lawyer, unless

15   it is a direct answer to my question.

16        A.    All right.

17        Q.    I'm hearing this and I want you to tell

18   me if I've done it right.  You knew if not in the

19   beginning of your employment with United, but

20   certainly before the termination of your employment

21   that it was a 12-month employment requirement for

22   eligibility to get in the competitive transfer pool?

23        A.    Yes.

24        Q.    You knew that a competitive transfer

25   request form had a section to be completed by the

1

2     A.    No, it turns out a good copy is something

3   Jeff had, that's all, after this round trip. But

4   you would have required the original anyway. I'm

5   sorry. What was the question?

6        MR. ROSENFELD: Read where I was, will

7     you please.

8        (Question read)

9     Q.    -- did he not explain to you that you

10  had not successfully completed the probationary

11  period?

12     A.    No.

13     Q.    Did you ever have any conversation with

14  Mr. Cafiero concerning whether you have or have not

15  terminated the probationary period?

16     A.    Yes. We did discuss it.

17     Q.    When was that?

18     A.    You know what, I have to correct what I

19  said a moment ago. He did -- your question about

20  whether I completed probation successfully. He had

21  said I had not.

22     Q.    And when did he tell you that?

23     A.    During this very --

24     Q.    During this meeting?

25     A.    Let me think for a moment. He had told

Hoffman                                    56

1
2   me earlier -- either earlier in the day or the day
3   before, not during the same meeting -- he had told
4   me that he had proposed to extend my probation and I
5   had refused that.  I think that's the sequence of
6   events.

7              There was a conversation about the
8   probation extension and there was a conversation
9   that we discussed for the last half hour.
10       Q.    But my question is, when he told you that
11  you were terminated, did he not tell you you had not
12  successfully completed the probationary period?
13       A.    I think he did.
14       Q.    What was your point earlier, in light of
15  that testimony -- I think you're right on that --
16  what is your point earlier where you said that your
17  probationary period had already passed.  It passed
18  sometime during your employment?
19       A.    The previous conversation to the one we
20  spent a half hour on, the termination conversation
21  let's call it, and the termination conversation both
22  took place a short time after probation had
23  finished, the six-month period had finished.
24              Does that make sense?  Do you follow?
25       Q.    Six months on the calendar had actually

1

2    meaning what jobs did you apply for?

3        A.    The only one -- I didn't apply for any

4    because I wasn't given the opportunity to apply for

5    any.  There were no positions available.

6              I attempted to get a similar position at

7    LaGuardia and I also looked into the possibility of

8    becoming a cook, I think it's called, in an off-site

9    facility near Kennedy, I think.

10       Q.    Before coming to work for United you had

11   previously applied for a pilot position at United,

12   had you not?

13       A.    I think so.

14       Q.    How many different applications had you

15   submitted?

16       A.    I guess one.

17       Q.    What year was that?

18       A.    I think sometime before -- what year?

19   Good question.  1990, for argument sake.

20       Q.    And how far down into the process had you

21   gotten with that?  Had you completed the application

22   for flight officer, a form?

23       A.    I believe so.

24       Q.    Did you get to the interview stage?

25       A.    No.  No.

```
1                        Hoffman                      78

2    Q.    What made you think you were going to --

3    you had any chance of getting to the interview stage

4    using the other route, even if you had been employed

5    for 12 months as an SOR?

6    A.    Talking to numerous people before I was

7    employed, let alone after I was employed.  The idea

8    actually was not sprung by me to do this.  I didn't

9    think it was.  I met --

10   Q.    Are you speaking about the idea of

11   getting another job at United so as to become

12   eligible for the competitive transfer process?  Is

13   that what you are talking about?

14   A.    I'm talking about being employed with

15   United is better than not being employed with United

16   if I'm trying to get a pilot's job as an employee.

17   Q.    Why is that?

18   A.    Logic would dictate that that would be

19   the case.

20   Q.    Why?

21   A.    Bear with me for just a moment.

22         You were starting to ask about the

23   evolution of this idea of becoming an employee and

24   then applying for the pilot job.

25   Q.    That's not the question.  Why was it more
```

Hoffman                                    79

1

2    advantageous to apply for a pilot position as a

3    United employee rather than as a non-United

4    employee?

5        A.    I think that those that make the hiring

6    decisions would prefer an employee than a

7    non-employee if he or she is being considered as an

8    employee or insider or as a candidate.

9        Q.    That's all you think of in response to

10   this question?

11       A.    I think of a variety of things but I

12   think that's most on point.

13       Q.    Have you applied to airlines other than

14   United for a pilot position?

15       A.    Prior to but not subsequent to my United

16   Airlines application.

17       Q.    What other airlines were those?

18       A.    I don't remember.  Perhaps Continental,

19   perhaps American.  At least one of the majors.  I

20   learned quickly that I didn't have the skill, hours

21   or experience to qualify for a job in any other way

22   than the one that we've contemplated.  That idea was

23   sprung by talking to one of the colleagues --

24   colleagues is the wrong word -- one of the

25   management at United.

1
2          As I knew, I didn't have sufficient

3    experience to qualify for a job with United,

4    American, Continental or any of the 121 carriers.

5    There was no point if my reapplying, reapplying

6    reapplying.  It would go nowhere.

7          However, as I met a variety of senior

8    executives, including Edward Mathot, captain, flight

9    domicile operations director, having had met him he

10   said the way you can, aside from becoming a flight

11   instructor and/or flying with the commuters, get a

12   job, if you qualify, as far as the pilot corps is

13   concerned, and he encouraged me to do this, was to

14   get a job with United Airlines and then make the

15   request to transfer.  That's where this idea came

16   from.

17          That was my motive for being in this job.

18   Being paid $7 an hour was not my favorite choice.

19   That's why I indicated to you that being worked more

20   than part time was problematic to me because I had a

21   whole other life that I had to attend to, and I was

22   hired part time to complete my duties and eventually

23   transfer.

24          Q.    You said Captain Mathot?

25          A.    Yes.

Hoffman                                    81

1
2      Q.     Did he tell you about the one-year
3  eligibility requirement?
4      A.     I don't know.  I don't know.
5      Q.     Did you write him for help to get a pilot
6  position after you were fired?
7      A.     No.  I don't believe so.
8      Q.     Did you call him?
9      A.     I don't think so.
10     Q.     Did you ever ask anybody at United for a
11 waiver of the one-year requirement?
12     A.     I don't know.  I don't think so.
13     Q.     Well, let's start with Mr. Cafiero, did
14 you ask him for a one-year --
15     A.     I don't think so.  I'm not in the
16 personnel business.  It was clear that I had to fill
17 out the competitive transfer request, and it was
18 clear that Bob was honorable with me the whole time
19 he was there.  That was satisfactory to me.
20     Q.     You were also clear there was a one-year
21 eligibility requirement, am I right?
22     A.     As we discuss it more and more, it
23 becomes a memory.
24     Q.     Was this not clear to you way before you
25 completed the competitive transfer request form

# EXHIBIT B

# 15-4

# employment
# and
# placement



- employment
- transfer
- selection & placement
- etc. . . .



UNITED

DEFENDANT'S
EXHIBIT
C

# /// UNITED AIRLINES / PERSONNEL REGULATIONS

15-4
EMPLOYMENT AND PLACEMENT

TABLE OF CONTENTS

INTRODUCTION ................................................................. III

**PART 1: EMPLOYMENT**

EMPLOYMENT - GENERAL .................................................. 5

EMPLOYMENT PROCEDURES ................................................ 13

FLIGHT ATTENDANT EMPLOYMENT .......................................... 17

FLIGHT OFFICER EMPLOYMENT ............................................ 21

PROFESSIONAL EMPLOYMENT .............................................. 25

GENERAL EMPLOYMENT ................................................... 29

FINAL EMPLOYMENT PROCEDURES .......................................... 35

**PART 2: TRANSFER**

EMPLOYEE REQUESTED TRANSFERS TO NON-MANAGEMENT POSITIONS ............... 43

TRANSFER PROCEDURES .................................................. 51

**PART 3**

SELECTION AND PLACEMENT .............................................. 63

PERSONNEL REQUISITION ................................................ 67

RECLASSIFICATION APPROVAL (UPE 1213) ................................. 75

END

A 68



PERSONNEL REGULATIONS

**Part Two**

Transfer

15-4
4/1/81
Page 41

## ☰ UNITED AIRLINES / PERSONNEL REGULATIONS

B. <u>Competitive Transfer</u>   Normally a request to change job classification. Eligible employees may request transfer to any non-management position except those whose entry is regulated by a collective bargaining agreement (i.e., Lead Mechanic). Also included as competitive transfers are those submitted by part-time IAMAW represented employees to change location within their same classification.

5. ELIGIBILITY

A. <u>In-Classification Transfer</u>   Non-management, non-union employees must complete one year of service to be eligible to request transfer. Thereafter, employees may request transfer in-classification after completing six months at the new organization or location.

B. <u>Competitive Transfer</u>   Employees must complete one year of service to be eligible to request transfer. Thereafter, employees may request competitive transfer after completing one year in the new job classification.

NOTE:  Laid-off employees are eligible to submit transfer requests and normal waiting periods are waived. Laid-off employees submitting transfer requests must contact the Employment Center responsible for the processing of the request, by mail, 30 days before the expiration date if they wish to renew the request.

C. <u>Work Status Change</u>   Non-management, non-union employees may request a work status change within the same organization and classification at any time.

D. <u>Eligibility Exceptions</u> - Requires approval of the employee's Division Personnel.

6. RULES

A. <u>Five Request Limit</u>   An employee can have no more than 5 Transfer Requests active at any one time. Each Transfer Request must specify one position and one location only. Division Personnel must approve exceptions.

B. <u>Expiration Date</u>   Transfer Requests expire automatically without notice one year from the effective date indicated by the originating Employment Center. A new Transfer Request (UPE 1818) must be completed and processed to reactivate a request. The Employment Center will forward the expired transfer request to the supervisor for inclusion in the employment file.

C. <u>Medical Qualification</u>   Employees transferring to positions where the medical qualifications differ from those in the present position must meet the medical requirements of the new positon. Such testing is at company expense unless otherwise noted.  See Regulations 15-16, Personnel General (Medical Examinations).

D. <u>Skills and Abilities</u>   Employees requesting transfers must possess all job skills and abilities that are specified for the position in company job descriptions, Regulations 18-6. Employees unable to perform certain duties specified in 18-6 (such as physical lifting, typing, shorthand, etc.) must indicate such limitation on the Transfer Request form. Any limitations will be reviewed with the potential receiving organization to determine if an accommodation can be made, if required.

A 70

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

PETER HOFFMAN,

               Plaintiff,

       v.                 99 Civ 1375 (WHP)(THK)

UNITED AIR LINES, INC.

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORIGINAL**

                           March 29, 2000
                           3:50 p.m.

          Deposition of ROBERT M. CAFIERO, taken by plaintiff, at the offices of Seyfarth Shaw Fairweather & Geraldson, 1270 Avenue of the Americas, New York, N.Y. 10020, before Joseph B. Pirozzi, a Registered Professional Reporter and Notary Public of the State of New York.

APR 28 2000

Hoffman                                    6

1

2      Q.    And have you ever used that policy?

3      A.    My recollection --

4      Q.    The procedure, I should say.

5      A.    Have I ever used the procedure?

6      Q.    Because you said it was not a policy, I

7   mean a procedure.

8      A.    I can recall once, maybe twice, in all my

9   years with the company having used it.

10     Q.    And when you used it, you filed a waiver

11  request?

12     A.    I did not.  Recommendation is to my

13  immediate boss who is the manager of the department

14  who files the waiver.

15     Q.    Do you remember Grodin, Jim Grodin?

16     A.    Yes, I do.

17     Q.    And do you remember that he used a

18  competitive transfer request to change his location?

19     A.    I was not aware of him filing the

20  competitive transfer request.  I don't recall Mr.

21  Grodin's transfer in any kind of detail, to be

22  honest.

23     Q.    What was his job?

24     A.    While he was in my employ?

25     Q.    Yes.

1

2     A.    Station operations representative.

3     Q.    Do you remember that he was hired at

4 approximately the same time as Peter Hoffman?

5     A.    I couldn't say.  To my recollection, he

6 transferred in from Los Angeles, as I recall, same

7 -- time frame, I can't give you.

8     Q.    And how long was he working as an SOR?

9     A.    Again, I --

10     Q.    At Kennedy?

11     A.    I can't tell you.

12     Q.    Do you remember Brenda Rosen?

13     A.    No.

14     Q.    Do you remember discussing with Peter

15 Hoffman extending his probation?

16     A.    No, I do not.

17     Q.    Do you remember discussing with Peter

18 Hoffman terminating his employment as an SOR?

19     A.    I remember it happening, the details of

20 which I would be hard-pressed to give you.

21     Q.    Do you remember agreeing with Peter

22 Hoffman to process his competitive transfer request?

23     A.    After listening to the deposition given

24 by Mr. Hoffman, some thoughts came back to me

25 regarding his competitive transfer request.

1                          Hoffman                          8

2              Peter and I did discuss it.  I mentioned

3      to Peter that I could not forward this to Chicago

4      formally because of the 12-month, but I would give

5      it to flight operations for review, knowing that

6      they were always looking for people in that

7      department in an intern or administrative capacity.

8          Q.    Do you remember that when you discussed

9      that with Peter Hoffman he agreed with you that he

10     would resign from his position and you would rescind

11     a termination?

12         A.    If you are asking me if we would accept

13     his resignation in lieu of my firing him, I don't

14     recall the exact details, but the evidence that I've

15     seen in the records indicate that that's what took

16     place.

17         Q.    Does this sort of jog your memory that

18     you recall that that happened?

19         A.    Judging from the review of the records,

20     yes.

21         Q.    And was that under an agreement that you

22     would process his competitive transfer request and

23     he would resign?

24         A.    I don't recall that.

25         Q.    Do you recall when the competitive

Hoffman                                          11

A.    I would not have sent this on.

Q.    Could you explain that?

A.    I discussed this with Peter, I think a number of times, that this document cannot be formally processed because of the 12-month requirement and that I would present it to the flight operations division for them to go over Peter's work history.

Q.    And where was the flight operations division?

A.    Right down the hall.

Q.    And did you agree with Mr. Hoffman that you would do that?

A.    Yes.

Q.    And when you agreed with Mr. Hoffman that you would submit it to flight operations, did you intend that it would be in a viable form for their consideration?

A.    No.  The only thing I told Peter I would do for him is let them know Peter's interest in securing a position in that division.

Q.    And what happened next?

A.    I reviewed the case with flight ops and I know I did do that.  Exactly what transpired with

1

2      A.     I can request through my manager to have

3   him grant anyone in the department a waiver based

4   upon circumstances, yes.

5      Q.     And did you in this case for Mr. Hoffman?

6      A.     No, I did not.

7      Q.     Why not?

8      A.     Because I didn't formally process the

9   competitive transfer.

10      Q.     Now, when you said earlier that at the

11   beginning Mr. Hoffman was a very good or exemplary

12   employee and then there developed some problems,

13   what were you referring to?

14      A.     Peter had two very big problems working

15   in the planning center. Number one was, he would do

16   his work, he would get up and he would talk to every

17   available pilot or go down the hall, which was just

18   a few steps away, into flight operations and grab

19   whoever he could in there and strike up a

20   conversation.

21          This was noted, not only by myself, but

22   during the periods of time that I was not at work

23   and the shift supervisor was his direct supervisor,

24   and it was fed back to me.

25          The other big problem that I had with

Hoffman                                    18

1

2    Peter was his inability to get along with his

3    co-workers.

4              This was discussed with Peter on many

5    occasions throughout the period of time that he

6    worked in the planning center, which ultimately led

7    up to my asking for his resignation.

8        Q.    Who was the shift supervisor who you

9    referred to earlier?

10       A.    There were many.  We had at the time

11   about nine different supervisors working in the

12   department.

13       Q.    And did he have trouble with all of them?

14       A.    I got reports from quite a few.  At least

15   half.

16       Q.    So at least five?

17       A.    Yes.

18       Q.    And do you remember any one of the names

19   of those five?

20       A.    Specifically with a name attached, no.

21       Q.    Do you remember any of the co-workers

22   with whom he had conflicts?

23       A.    One Peter even mentioned the name, Daniel

24   Bien.

25       Q.    And did Mr. Bien have any problem with

Hoffman                    20

waiver of the 12-month requirement in order for it

to be considered, is that correct?

    A.    If the form was going to be filed, the

waiver needed to be attached.  The intention was not

for it to be formally filed at that time.

    Q.    You never intended to formally file it?

    A.    I couldn't formally file it.  That form

was completed after Peter's termination.

    Q.    And would there be a way to have a waiver

of the fact that he was no longer an employee?

    A.    If there is one, I am not aware of it.

    Q.    So you told Peter that you would talk to

flight operations and try to help him in any way he

could to become a flight officer or a pilot, is that

correct?

    A.    No.  I told Peter -- Peter and I had

conversation about him joining the division in some

capacity, not specifically a flight officer.  It may

have included that conversation but not specifically

a flight officer.  We had this conversation

throughout Peter's tenure.

    Peter made it very clear to me and

everyone else that worked there that he eventually

wanted to get into flight operations.

Hoffman                                    27

2   and we discussed problems many times over, I always

3   told Peter that I regarded him as a very capable

4   employee, a very smart man.  That wasn't the

5   problem.  The problem was his inability to get along

6   with his co-workers and his almost being bored in

7   the job, completing his tasks, getting up and

8   disappearing.

9                His job performance was not the issue.

10  His work ethics, while in the job, was an issue.

11      Q.    Is it United's policy when asking for

12  resignations to say that a person resigned for

13  personal reasons instead of saying they were fired

14  or terminated?

15      A.    Like I said before, we give the employee

16  the option.  It makes things less complicated for

17  both United Airlines, and the employee who wants to

18  seek other employment.

19      Q.    And it is United's policy to write that

20  down on whatever documents concluding competitive

21  transfer requests?

22      A.    If they accept that option -- on the

23  transfer request?

24      Q.    Yes.

25      A.    Well, again, to close the file, I used

# EXHIBIT D

**Peter L. Hoffman**
345 East 73rd Street, Apt. 10A
New York, NY 10021-3765
(212) 734 3331

December 18, 1992

Mr. Robert Cafiero
Supervisor
United Airlines
JFKCG
Bldg. 59
JFK Airport
Jamaica, NY  11430

Dear Bob:

Due to personal reasons, I hereby tender my resignation from United Airlines, JFKOO as a Station Operations Representative effective January 4, 1993.

I am very glad to have had the opportunity to work for you in the UAL JFK Airport Planning Center and Flight Operations Department.

I sincerely hope, should circumstances permit, I again will be given the opportunity to work for United Airlines.

I wish you the best in the Holiday season.

Sincerely yours,

*Peter L. Hoffman*
Peter L. Hoffman

EXHIBIT
DX-7
3/29/00

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


In re:                          )
                                ) No. 02 B 48191
UAL CORP., et al.,              )
                                ) Chicago, Illinois
                                ) June 28, 2007
                    Debtor.      ) 10:00 a.m.


TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE EUGENE R. WEDOFF


APPEARANCES:

MR. MIKE SLADE
on behalf of United;

MS. ELLEN YEARWOOD
on behalf of Leon Ramsey.


ALSO PRESENT:

MR. PETER HOFFMAN (TELEPHONICALLY).

Page 2

1           THE CLERK:  UAL Corporation, 02 B 48191.

2           THE COURT:  Okay.  Let's take up

3 Mr. Hoffman's matter first.

4              Would you state your appearance,

5 Mr. Hoffman.

6           MR. HOFFMAN:  Peter Hoffman, Your Honor.

7           THE COURT:  Okay.

8           MR. SLADE:  Your Honor, Mike Slade for

9 United.

10           THE COURT:  Okay.  I have a ruling to

11 read into the record.  This matter is before the

12 court, claim number 345 of Peter Hoffman, on

13 United's objection.  Mr. Hoffman's claim is based on

14 damages arising from an alleged failure by United to

15 process his Competitive Transfer Review, or CTR, to

16 become a pilot in violation of an alleged oral

17 contract.  Hoffman alleges that, had the CTR been

18 processed, United would have hired him as a pilot.

19 Hoffman brought this claim in New York state court

20 in 1999 and United removed it to federal district

21 court.  The parties completed discovery, as

22 reflected in the case's docket report and two orders

23 of the magistrate judge presiding over the case.

24 United moved for summary judgment.  However, before

25 judgment could be rendered, United filed for

1 bankruptcy and Hoffman filed his claim as a creditor

2 of the estate.  United objects to the claim on two

3 grounds.  First, United argues that New York's

4 statute of limitations bars this claim.  Second,

5 United argues that Hoffman's claim fails on its

6 merits.

7                    At an earlier hearing, this court

8 rejected United's statute of limitations argument

9 and instructed the parties to address the merits.

10 United filed a motion for reconsideration of its

11 statute of limitations defense and both parties

12 submitted arguments regarding the merits.  Both

13 motions are now ready for ruling.

14                    United's motion for reconsideration

15 will be denied.  As discussed on the record on

16 May 17, 2007, United had a reasonable amount of time

17 to complete the alleged oral contract, and the

18 statute of limitations did not begin running until

19 after that reasonable time period ended.  Again, as

20 previously discussed, the length of that reasonable

21 period is a question of fact under New York law.

22                    On the merits, however, United's

23 objection will be sustained and the claim will be

24 disallowed.  By objecting to the claim under Section

25 502(b) of the Bankruptcy Code, Title 11 U.S.C.,

Page 4

1 United instituted a contested matter is adjudicated

2 in accordance with Rule 9014 of the Federal Rules of

3 Bankruptcy Procedure.  Rule 9014(c) applies to

4 contested matters the provisions of Bankruptcy Rule

5 7056, which, in turn, incorporates Rule 56 of the

6 Federal Rules of Civil Procedure.  Summary judgment

7 is thus available in the claims adjudication

8 process.

9              Accordingly, the legal standard to

10 be applied is whether there is any genuine issue as

11 to any material fact such that this matter should be

12 set for trial.  In order to prevail, Hoffman must

13 establish that he would have been hired as a pilot

14 had the CTR been processed.  This is a material

15 fact.  See Fishman versus Teter, 133 F.2d 222,

16 Seventh Circuit, 1943, defining a material fact as

17 one that a party must establish in order to prevail.

18              A genuine issue as to this material

19 fact would exist if there were sufficient evidence

20 favoring Hoffman for a jury to return a verdict in

21 his favor.  Anderson versus Liberty Lobby, Inc., 477

22 U.S. 242, 1986.  Because Hoffman has offered no

23 evidence to support this fact, summary judgment is

24 appropriate.  Save Our Cemeteries, Inc. versus

25 Archdiocese of New Orleans, Inc., 548 F.2d 1074,

1 1077, Fifth Circuit, 1978.

2                    To support its contention that

3 Hoffman would not have been hired as a pilot, even

4 had the CTR been processed, United offered Hoffman's

5 own admission that he was not qualified to be a

6 pilot and that his application for that position had

7 been rejected by other major airlines.  In response,

8 Hoffman claims that he would have been hired through

9 the CTR process in spite of his lack of

10 qualification, but Hoffman offers no evidence at all

11 to support this assertion.  The only evidence before

12 the court is that Hoffman is not qualified to be a

13 pilot, and the only reasonable conclusion is that he

14 would not have been hired as a pilot even had the

15 CTR been processed.

16                    Furthermore, summary judgment cannot

17 be denied on the basis that more discovery would be

18 appropriate.  Hoffman was given a full opportunity

19 to pursue discovery in the previous litigation,

20 making additional discovery here inappropriate.  If

21 he was unable to discover any evidence to put this

22 crucial fact at issue during the time when discovery

23 was open in the New York proceeding, it is very

24 unlikely he would be able to do so now, 15 years

25 after the events in question.  United's objection to

1 this claim will therefore be sustained and the claim

2 disallowed in its entirety.

3          MR. SLADE:  Thank you, Judge.  Do you

4 need a separate order from us or are you just going

5 to -- okay.  We'll get that to Ms. William.

6          THE COURT:  Okay.  Mr. Hoffman, you'll

7 have a right to appeal that will begin running as

8 soon as the order is docketed, so you'll want to

9 check, if you do wish to pursue appeal, to find out

10 when that docketing takes place.  I believe you have

11 ten days thereafter to file a notice of appeal in

12 the district court.

13          MR. HOFFMAN:  Understood.  Your Honor,

14 can I ask a question or two?

15          THE COURT:  At this point I don't think

16 that would be necessary, but go ahead.

17          MR. HOFFMAN:  Would you permit me to make

18 a motion to reargue because the court may have

19 missed something in its ruling on --

20          THE COURT:  You have rights, Mr. Hoffman,

21 to seek my review under Bankruptcy Rule 9023 or

22 9024.  You might want to check those out.

23          MR. HOFFMAN:  Okay.  And I think, Your

24 Honor, you might have missed something in my papers

25 that --

1            THE COURT:  Well, that's what 9023 and

2 9024 are designed to address.

3            MR. HOFFMAN:  It seems, Your Honor, that

4 you read this from notes or something.  Is it

5 possible for me to get a copy of what you read?

6            THE COURT:  Yes.  You can talk with the

7 court reporter to get a transcript.

8            MR. HOFFMAN:  Would I be able -- that's a

9 little bit cumbersome.  Would it be possible to just

10 ask your courtroom deputy to provide me a copy of

11 what you read --

12            THE COURT:  No, that's not possible.  You

13 need to contact the court reporter.  The deputy

14 doesn't have access to the transcript.

15            MR. HOFFMAN:  And what you've read is not

16 available to --

17            THE COURT:  It is available through the

18 court reporter.

19            MR. HOFFMAN:  Okay.

20            THE COURT:  Okay.

21            MR. HOFFMAN:  All right.  Very well.

22            THE COURT:  Okay.

23            MR. HOFFMAN:  Thank you very much.

24            THE COURT:  Now, there are other matters

25 on the call today.

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **UAL CORPORATION, et al.,** | ) | **Case No. 02 B 48191** |
| | ) | **(Jointly Administered)** |
| Reorganized Debtors. | ) | |
| | ) | **Honorable Eugene R. Wedoff** |
| | ) | |

## ORDER GRANTING ADDITIONAL RELIEF SOUGHT IN THE REORGANIZED DEBTORS' FORTY-SEVENTH OMNIBUS OBJECTION TO CLAIMS [RELATED TO DOCKET NO. 16538]

### REGARDING CLAIM OF PETER HOFFMAN, CLAIM NO. 345

Upon the above-captioned reorganized debtors' (collectively, the "Reorganized Debtors") Forty-Seventh Omnibus Objection seeking entry of an order expunging, reducing or reclassifying claims; and no previous application for such relief having been made; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157 and 1334; and upon consideration of the Reorganized Debtors' Forty-Seventh Omnibus Objection, claimant's response briefs, and the Reorganized Debtors' reply briefs; and due and proper notice of the Reorganized Debtors' Forty-Seventh Omnibus Objection having been given; and it appearing that no other notice need be given; and after due deliberation and sufficient cause appearing therefor; it is HEREBY ORDERED:

1.      Claim No. 345, filed on behalf of Peter Hoffman, is disallowed in its entirety for the reasons stated on the record in open court on June 28, 2007.

2.       Poorman-Douglas, as the Reorganized Debtors' notice and claims agent, is hereby authorized and directed to update the Reorganized Debtors' Claims register to reflect the disallowance of Claim directed by this Order.

3.       This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

4.       Notwithstanding the possible applicability of Bankruptcy Rules 6004(g), 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5.       All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

Chicago, Illinois
Dated: _____, 2007

Eugene R. Wedoff
United States Bankruptcy Judge
6/28/07

2

K&E 11665918.1

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
JUL 1 9 2007
KENNETH S. GARDNER, CLERK
PS REP. · SJ

Chapter 11

In re:

Case No. 02B48191

*United Airlines, Inc.,*

        Debtor

**NOTICE OF MOTION FOR
RECONSIDERATION OF THE
COURT'S JUNE 28TH, 2007 RULING**

Hon E R. Wedoff
Hearing on: July 31st, 2007

| Creditor: | Case: | Claim#: | Claim Date: | Claim Total: |
|-----------|-------|---------|-------------|--------------|
| Peter Hoffman | 02-48210 | 345 | 2/6/03 | $2,250,000.00 |

PLEASE TAKE NOTICE that upon the annexed Affidavit of Peter L. Hoffman, sworn to on July 12, 2007, and upon the pleadings and proceedings had herein, the Creditor, Peter L. Hoffman will move the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division for an order.

WHERE:        United States Bankruptcy Court for the Northern District of Illinois
                    219 S. Dearborn St.
                    Chicago, Illinois 60604

WHEN:         July 31, 2007

RELIEF SOUGHT:

      Respectfully requesting that the Court enter an Order:

        a.      Vacating the order handed down on June 28, 2007; and
        b.      Denying the Debtor's objection to this Creditor's claim; and
        c.      Permitting limited further discovery; and
        d.      Permitting the matter to proceed to a status conference or as the Court sees fit; and
        e.      Awarding to Creditor such other and further relief as this Court may deem just and proper.

Dated: Upton, MA
        July 12, 2007

                                  Yours, etc.

                                    Peter Hoffman
                                    Creditor
                                    42 Walnut Street
                                    Upton, MA 01568
                                    212-794-1000

**FILED**
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
JUL 1 9 2007
KENNETH S. GARDNER, CLERK
PS REP. - SJ

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Chapter 11

In re:

Case No. 02B48191

*United Airlines, Inc.,*

**AFFIDAVIT IN SUPPORT FOR
RECONSIDERATION OF THE
COURT'S JUNE 28th, 2007
RULING**

Debtor

Hon E R. Wedoff
Hearing on: July 31st, 2007

| Creditor: | Case: | Claim#: | Claim Date: | Claim Total: |
| --- | --- | --- | --- | --- |
| Peter Hoffman | 02-48210 | 345 | 2/6/03 | $2,250,000.00 |

PETER L. HOFFMAN, being duly sworn, deposes and says:

1. I am a Creditor in the above captioned proceeding. I make this affidavit based on personal knowledge of the facts to which I can testify as a witness or where noted upon information and belief that I trust to be true from the circumstances.

2. I am not an attorney, I am pro se and request appropriate latitude be extended to me regarding standards to which licensed attorneys are held.

3. The following evidence, provided here in an <u>offer of proof</u>, will support the fact that I, Peter Hoffman, was qualified to be hired as a pilot, the central factor that the court cited in its June 28th, 2007 ruling to disallow this claim.

   a)    **MEDICALLY QUALIFIED**

   I held a <u>First Class Medical Certificate</u> for the entire period in question. Hereto attached as <u>Exhibit A</u> I have included my Medical Certificates from January 30, 1991 to January 6, 1993.

   **NOTE**
   Starting many years before 1992 and continuing many years afterwards, I sought and obtained a first class medical certificate. This class of certification is the highest level of certification available to a civilian pilot in the United States, the certificate that airline pilots possess. The certificate, as one might imagine, is

2

only issued to medically and physiologically healthy pilots with good backgrounds.

**NOTE**
§ 61.23 (FAR)  <u>Medical certificates</u>: Requirement and duration. (partial)
(a) Operations requiring a medical certificate. Except as provided in paragraphs (b) and (c) of this section, a person—
(1) Must hold a first-class medical certificate when exercising the privileges of an airline transport pilot certificate;
(2) Must hold at least a second-class medical certificate when exercising the privileges of a commercial pilot certificate;

b)     **CERTIFICATE/FAA QUALIFIED**

At all times for the period 1992, I held <u>commercial and instrument pilot certificate for airplanes (singe engine land & multi engine land)</u>.  Hereto attached as <u>Exhibit B</u>, I have attached a copy of my FAA issued Pilot Certificate dated October 15, 2003.  I represent under penalty of perjury that prior to 1992 that I held the same certificates and ratings.

**NOTE** (Source: FAA, Air Carrier Flight Training Branch)
In order to be hired and deployed as a pilot by any US "121" airline (such as UAL) one must have at least:
-Commercial Pilot Certificate
-Instrument Pilot Certificate
-Multi Engine Land Pilot Certificate
-First Class Medical Certificate

**NOTE**
On the copies of my log book, provided with this affidavit, coincidentally, one may note, on line one, that I successfully flew a <u>DC-10 simulator with a UAL "Standards and Evaluation" Capt</u>.  This privilege would normally be granted to pilots only.  Simulator time is valuable.  Available time on the simulator is often available at a premium.  While I may not have been a pilot with UAL, I was respected enough to be granted the privilege to have a half hour of training with a highly qualified Capt of as well on a multi million dollar simulator.

**NOTE**
The International Women's Society for Airline Pilots
<u>www.iswap.org/html/tips.html</u> have titrated requirements into a very simple form.
The following is an excerpt for requirements for pilots:

<u>Commercial Pilot Certificate</u>: Must be 18 years old, have a
second class medical, a minimum of either 190 hours (FAR Part 141) or 250 hours (FAR Part 61) of flight time, of which you must have 10 hours in a high performance aircraft, 100 hours solo, and 40 hours cross country. You must successfully complete a written exam and an FAA flight test. Now you may fly

**A 95**

for hire. However, you will have restricted privileges if you do not have an instrument rating.

Airline Transport Pilot Certificate (ATP): Must be 23 years old, a high school graduate or equivalent, possess a commercial certificate, first class medical (if your eyesight is worse than 20/200, you must obtain a waiver), 1500 PIC hours, pass a written exam and an FAA flight test. Now you may perform Pilot-in-Command (PIC) duties in airline and other transport operations

ADDITIONS TO PILOT CERTIFICATES:
Instrument Rating - 125 total hours required, including 40 hours instrument training of which 15 hours must be with an instrument instructor in an airplane, 50 hours Pilot-In-Command cross country time, written test and an FAA flight test. Now you can fly in the clouds (IFR).

Multiengine Rating - Usually around 10 hours multiengine training and an FAA flight test. Now you can fly smaller aircraft with more than one engine.

Type Ratings - Usually specialized training in one specific aircraft. Required for all jets and large propeller aircraft.

The only certificate necessary to fly for the airlines is the Commercial Certificate with instrument rating.

c)      **THE COURT RULES THAT HOFFMAN IS NOT QUALIFIED TO BE A PILOT (BY HOFFMAN'S OWN ADMISSION)**

Perhaps Your Honor mistakenly misunderstood my explanation, for the statements made by me during my deposition (which were taken out of context), contained in my Sur Reply dated June 22nd, 2007. It is listed below in italics.

*Once again United is being misleading.*

*As an outsider, I would likely have not be chosen for an interview with most of the major airline carriers despite being qualified. However, as (an) insider, I would have been chosen for the interview and likely ultimately become a United Pilot.*

*I would not have taken this $7 per hour job if the above United statement that I was "woefully unqualified" was accurate. There is no question, which may be proven, that applicants with far LESS QUALIFICATIONS than I were hired in this same time frame. Should the court permit further discovery, this too would be borne out by discovery results. As I have mentioned to United counsel during informal discussions, traditionally, the most difficult part of getting an airline job is getting the interview, NOT getting the job. As an employee of United one would normally be*

4

> *granted an interview, assuming that the requisite minimums were met. My qualifications were far above the required minimum qualifications at that time.*

There must be finding that there is a question of fact regarding this question of whether I was qualified to become a Pilot or not. I claim, and has NOT refuted, particularly with any evidence or proof, that the standard that UAL was guided by during the period in question was one that shows that I did not meet. <u>One must note that any writing offered by showing the minimum qualifications are conspicuously absent.</u> I, on the other hand, have now provided an outline of standards that was guided by as well as my qualifications with evidence to support my statements (see para a, b & e).

**d)**   **SENIORITY VS QUALIFICATIONS**

Regardless of ones' qualifications in the airline industry, it is customary and standard for the seniority to govern where in the cockpit (left seat (Capt) or right seat (First Officer also known as Second in Command)) and what aircraft one is assigned to (as a pilot). So whether one is a retiring naval aviator joining an airline or a person with far different qualifications like myself, the new hire is placed in these assignments according to seniority ONLY (with rare exceptions; e.g. Instructor Pilot, management, etc.). So, all new hire pilots are trained identically (some argue that less experienced pilots, especially non military, are more desirable because they can be more easily molded to the standards that the airline would like.) and are put into the right seat of an aircraft (First Officer) until he/she gains seniority and has been retrained for the new aircraft. Thus, despite my qualifications, I would likely not be placed in a 747 in the beginning of my career and definitely not be placed in command (Capt) of any aircraft. I would only be a first officer and likely on a far smaller aircraft (due to seniority).

**NOTE**

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&sid=16058bf9a4d693599aa8553c00760bb0&rgn=div5&view=text&node=14:2.0.1.1.2&idno=14#14:2.0.1.1.2.1.1.2

**§ 61.55   Second-in-command qualifications. (Excerpt) (Source:  FAA)**

(a) A person may serve as a second-in-command of an aircraft type certificated for more than one required pilot flight crewmember or in operations requiring a second-in-command pilot flight crewmember only if that person holds:
(1) At least a current private pilot certificate with the appropriate category and class rating; and
(2) An instrument rating or privilege that applies to the aircraft being flown if the flight is under IFR; and
(3) The appropriate pilot type rating for the aircraft unless the flight will be conducted as domestic flight operations within United States airspace.

(b) Except as provided in paragraph (e) of this section, no person may serve as a second-in-command of an aircraft type certificated for more than one required pilot flight crewmember or in operations requiring a second-in-command unless that person has within the previous 12 calendar months:
(1) Become familiar with the following information for the specific type aircraft for which second-in-command privileges are requested—

**e)      CTR WAS SUBMITTED**

While my Supervisor, Robert Cafiero is not qualified to vet pilot candidates, he is a seasoned  employee as well as a well respected member of management at . The fact that Bob completed the CTR, hereto attached as <u>Exhibit C</u>, certainly intimates that he felt that I was sufficiently qualified to forward my application for transfer to become a pilot.  Bob had spent decades at  and with and around pilots.  His decision to transfer me to the Pilot corps was not done in a vacuum. While the issuance and submission of the CTR is not despositive, it must provide some evidence of my qualifications.

**f)      ADA & EEOC**

It should be noted that in 1977 (perhaps before this year as well) the EEOC commenced an action against UAL.  As UAL had compliance issues, apparently, the EEOC as well as other governmental agencies and private parties commenced other actions against UAL.  One of the results of these actions were, in part, defining (and reducing) pilot hiring standards as well as a consent decree.  I have noted those standards, as best I am able, below in paragraph (g).  My understanding is that the cite is, *U.S. Court of Appeals 1977 EEOC v. , Inc., et al., 560 F. 2d 224 (June 28, 1977)*.

**g)      HIRING STANDARDS FOR EMPLOYEES (INTERNALS)**

During the year 1992 the minimum requirements to become an  Pilots were, in relevant part (taken from memory and experience as a pilot for over 25 years), as follows:

 (Source:  Capt. Ed Methot)
300 hours Total Time - Fixed Wing
Current First Class Medical
Current Commercial Certificate with Multi-engine land rating
High School diploma or GED equivalent
Legal to work in the United States.

<u>PETER HOFFMAN</u> (Source:  My documents)
650+ hours Total Time - Fixed Wing
Current First Class Medical
Current Commercial Certificate with Multi-engine Land rating